UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

REYNALDO PEREZ,

                    Plaintiff,

        v.                                                    **DECISION AND ORDER**

                                                              14-CV-81S

THE STATE OF NEW YORK, et al.,

                    Defendants.

## I.      INTRODUCTION

Before this Court are (a) Defendants' Motion for Summary Judgment (Docket No. 68) to dismiss this self-represented inmate's Complaint and (b) Plaintiff's Motion for Summary Judgment (Docket No. 56) granting in effect a default judgment against Defendant State of New York.  While no briefing schedule was set for Plaintiff's motion, this Court granted Plaintiff an extension of time to file his motion (Docket No. 72; see Docket No. 69) and the motion was due by November 30, 2017, responses were due by January 10, 2018, any reply by January 31, 2018 (Docket No. 72).  The motions then were deemed submitted without oral argument.

In support of his motion for summary judgment (Docket No. 56), Plaintiff submits his Declaration (Docket No. 55[1]), Statement of Material Facts (Docket Nos. 64, 62 (Notice of Statement)), and his Affidavit with exhibits (Docket No. 63).  He also filed a Request for Clerk's Entry of Default (Docket No. 65) against New York State but the Court Clerk

---

[1]This was identified as a motion on the docket.  The Court Clerk is instructed to terminate it, Docket No. 55, as a Motion.

did not enter default because New York State filed its Answer (Docket No. 43) in this action.

Meanwhile, Defendants submitted in support of their motion for summary judgment (Docket No. 68) their Statement (id., "Defs. Statement"); declarations from individual Defendants and document custodian for Department of Corrections and Community Services ("DOCCS") (id.); their Memorandum of Law (id.); and Plaintiff's medical record from DOCCS filed under seal (Docket No. 71, Ex. A; see also Docket Nos. 67 (motion to file under seal), 70 (Order sealing exhibit)).   Plaintiff responded (Docket No. 73); as explained below, this Court also considers portions of Plaintiff's motion (Docket Nos. 56, 62-64) as responding to Defendants' motion.  Defendants replied (Docket No. 74).  Both motions then were deemed submitted without oral argument.

For the reasons stated herein, Plaintiff's Motion (Docket No. 56) is **denied** and Defendants' Motion (Docket No. 68) is **granted**.

## II.    BACKGROUND

This is a pro se civil rights action by an inmate for denial of medical treatment and failure to provide reasonable accommodation for Plaintiff's hearing impairment due to purported Meniere's disease.  The claim arises solely during his incarceration at the Attica Correctional Facility (hereinafter "Attica") starting in December 2011.  He seeks damages from the DOCCS employees under 42 U.S.C. § 1983 for alleged deliberate indifference and against Defendant State of New York for violation of Plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C.§§ 12201, et seq. ("ADA"), and § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Docket No. 1, Compl.; see Docket 68, Defs. Memo. at 1).

A.  Pleadings

According to a previous Order (Docket No. 10, Order of June 30, 2015, at 3), Plaintiff alleged that he had hearing loss in his left ear (65-75%) since his childhood.  From December 2011 to September 2012, while in Attica, Plaintiff complained of further hearing loss in his left ear and problems with his right ear (id.).  Plaintiff sought treatment from the individual Defendants (id.).  In December 2011, Plaintiff sought treatment by a specialist, but he was diagnosed with Meniere's Disease in October 2012 (Docket No. 1, Compl. ¶¶ 2, 4).  On September 2012, Dr. Laskowski authorized an appointment with a specialist, after months of Plaintiff seeking this treatment (id. ¶ 5; Docket No. 10, Order at 3).

Plaintiff appears to have intended this action as a Claim destined for the New York Court of Claims but filed it in this Court instead (see Docket No. 6, Order of Sept. 10, 2014, at 1).  Plaintiff then indicated that he intended to proceed with a federal action under this Complaint (Docket No. 10, Order at 1; see Docket No. 7, Pl. response).  In construing this pro se pleading, this Court found that Plaintiff stated a § 1983 claim against the individual Defendants only (Docket No. 10, Order at 3-4), while stating Americans with Disabilities Act, 42 U.S.C. §§ 12201, et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, claims against New York State (id. at 5).  After Plaintiff filed a purported Amended Complaint to add subsequent claims arising in different correctional facilities (Docket No. 8), this Court found that the operative pleading was the initial Complaint (Docket No. 10, at 1)[2].  As discussed below regarding Plaintiff's summary judgment

_____

[2]The Court also denied Plaintiff's Motion, Docket No. 9, to change venue, Docket No. 12, Order of Sept. 3, 2015, since the clam was based on events at the Attica Correctional Facility in this District.

motion (Docket No. 56), Defendants were served and separately answered the Complaint (Docket Nos. 24, 32, 43).  The timing of New York State's Answer is at issue in Plaintiff's motion (see Docket No. 56).  The matter was referred to Magistrate Judge Foschio (Docket No. 25).

Plaintiff moved for leave to amend the Complaint to add defendants (Docket No. 75) and to compel discovery (Docket No. 81).  Both motions were denied by Magistrate Judge Foschio either as out of time under the Scheduling Order or beyond claims in this case (Docket Nos. 84, 85).

B.  Plaintiff's Motion for Summary Judgment (Docket No. 56)

Plaintiff alleges that he was transferred to Attica in 2009 and remained there until 2014 (Docket No. 64, Pl. Statement ¶ 1).  He contracted Meniere's disease and the facility's medical department was aware of the disease and failed to treat it (id.).  Medical staff at the facility and in DOCCS ignored Plaintiff's letters complaining about the lack of treatment (id. ¶ 2).  DOCCS was aware of Plaintiff's need in 2012 when a specialist diagnosed Meniere's disease and Plaintiff argues he should have been transferred to a Sensorial Correctional Facility "and not be bounced around the state prison system in the manner in which plaintiff was, causing plaintiff unnecessary suffering as well as pain" (id. ¶ 3).  Plaintiff's subsequent medical record reflected his diagnosis of hearing impairment, disclosed to each new facility he was transferred to (id. ¶ 4; see also Docket No. 64, Pl. Statement ¶ 3).

Plaintiff argues (Docket No. 55, Pl. Motion, Pl. Decl. ¶¶ 7-10) that New York State's Answer (Docket No. 43) was untimely, since this Court set a deadline for answering the Complaint 60 days from service (Docket No. 10, Order of June 26, 2015, at 7 & n.1; see

4

Docket No. 55, Pl. Decl. ¶ 7; Docket No. 65, Pl. Aff. ¶ 1).  Plaintiff filed returns of service from Defendants Dr. Evans and Dr. Laskowski on December 14, 2015 (Docket No. 16), and acknowledgement of service from Dr. Laskowski (Docket No. 21) and Dr. Evans (Docket No. 22).  Dr. Laskowski was served on January 4, 2016, and his answer was due by March 7, 2016 (Docket No. 21), while Dr. Evans was served on February 16, 2016, and his answer was due by April 18, 2016 (Docket No. 22).  Drs. Evans and Laskowski answered (Docket No. 24, Mar. 4, 2016), while King answered on April 26, 2016 (Docket No. 32).

New York State still had not been served (see Docket No. 30, Order of Mar. 29, 2016, at 2).  On March 29, 2016, Magistrate Judge Foschio granted Plaintiff in forma pauperis status and ordered service of the then-remaining defendants, specifically the State of New York, and directed them to answer (id.).  The Order did not set a deadline for the State's Answer.  On March 7, 2017, New York State filed its Answer (Docket No. 43).

Plaintiff argues that New York State's Answer was untimely, given the 2015 Order, thus Plaintiff should have judgment entered in his favor against New York State (Docket No. 55, Pl. Motion ¶¶ 7, 12-13; Docket No. 56, Pl. Memo. at 4), that New York State answered one year and nine months (Docket No. 65, Pl. Aff. ¶ 4) apparently from the June 2015 Order.  Plaintiff blames Assistant Attorney General in Charge Gary Levine for not responding for New York State in this action after receiving the June 2015 Order (id. ¶ 5).

Plaintiff also argues that defendants violated his rights from 2011 through 2014 (Docket No. 56, Pl. Memo. at 2-3) beyond the events in 2011-12 alleged in the Complaint.

Defendants did not respond to the timeliness of New York State's Answer (cf. Docket No. 74, Defs. Atty. Reply Decl. ¶ 9).

Substantively, Plaintiff argues that Defendant Dr. Laskowski should have posted on Plaintiff's chart a notation of the hearing impairment so Plaintiff would have been transferred to a sensorial prison (Docket No. 56, Pl. Memo. at 1).  Without that notation, Plaintiff was transferred in 2014 to Great Meadow Correctional Facility (a non-sensorial prison) without accommodation, commencing a series of transfers to other DOCCS facilities that mostly did not have sensorial accommodations (id. at 2).  An exception was Five Points Correctional Facility, a sensorial facility, DOCCS Dir. No. 2612 (Docket No. 63, Pl. Aff., Ex. B; Docket No. 68, Defs. Atty. Decl. Ex. D), where Plaintiff was transferred in 2015 until transfer to another, non-sensorial facility (Docket No. 56, Pl. Memo. at 3).  The directive states that Five Points "can only accommodate hard of hearing inmates (HL20), NOT deaf (HL10)," DOCCS Dir. No. 2612, III.C., at page 3 of 16 (emphasis in original) (Docket No. 63, Pl. Ex. B).  While in Five Points, Plaintiff alleges that he was not provided headphones  (id.).  He claims that he suffered from unnecessary pain from 2011 to 2015 (id. at 2).

       C.  Defense Motion for Summary Judgment (Docket No. 68)

           1.  Factual Allegations

According to defense motion and Statement of Facts (Docket No. 68), Drs. Laskowski, Evans and Ms. Indea King were employees of DOCCS (id. ¶ 2).  Plaintiff here alleges that Defendants were medically indifferent to his needs by ignoring his complaints about his hearing difficulty and request for treatment by a specialist (id. ¶ 3)

and that defendant State of New York denied Plaintiff reasonable accommodations (id. ¶ 4).

On October 28, 2011, Plaintiff was seen by Dr. Evans but did not complain about his hearing or request to meet a specialist (id. ¶ 6).  Plaintiff asserts that when he met with Dr. Evans the doctor "had to actually shout so that Plaintiff was able to hear what he was saying whenever Plaintiff was not looking at his mouth to be able to comprehend what defendant was saying," (Docket No. 73, Pl. Aff. ¶ 6; Docket No. 73, Pl. Memo. at Page 108 of 128[3]).  Defendants contend that Plaintiff first complained about his difficulty hearing in December 8, 2011 (Docket No. 68, Defs. Statement ¶ 7; Docket No. 71, Defs. Ex. A, Pl. Medical Records (filed under seal), Bates No. 000422).  Physician's Assistant Deborah Graf examined Plaintiff, noted the absence of redness in the ear and saw that the tympanic membrane was visible (Docket No. 68, Defs. Statement ¶ 8).   On December 22, 2011, defendant King met with Plaintiff (id. ¶ 9).  Defendants argue that Plaintiff did not complain about his hearing and King reviewed Plaintiff's MRI results and ordered an orthopedic consult (id. ¶ 9).  Plaintiff, however, asserts that he did complain about his hearing and that the interview with Ms. King on December 28, 2011, was difficult due to his obvious hearing impairment, with King asking Plaintiff to repeat some words that she said without looking at her mouth and then (after a few errors) pronouncing Plaintiff okay (Docket No. 73, Pl. Aff. ¶ 8).  Plaintiff thought that Ms. King would note this hearing difficulty in his medical chart but (upon review of his facility medical record) she did not (id. ¶ (first) 9).  On December 28, 2011, King noted in his chart about orthopedic

_____

[3]Plaintiff did not paginate this Memorandum, cf. W.D.N.Y. Loc. Civ. R. 10(a)(5), so cited pagination here is the electronic case filing header for this document.

appliances for Plaintiff, but she did not personally meet with Plaintiff on that date (Docket No. 68, Defs. Statement ¶ 10; id., Defs. Motion, Indea King Decl. ¶ 10).

Plaintiff was treated in Attica's medical unit on five occasions between December 30, 2011, and March 21, 2012, and each time did not complain about his hearing (Docket No. 68, Defs. Statement ¶ 11). On March 22, 2012, Plaintiff was seen complaining of hearing loss, with his examination showing that his ear canals were clear, thus a "normal" examination (id. ¶ 12). Defendants note that Plaintiff had no hearing complaints in April 2012 (id. ¶ 13). On May 7, 2012, Dr. Laskowski met with Plaintiff for complained lower back pain; during this appointment Plaintiff did not mention his hearing issues (id. ¶ 14).

Plaintiff did complain about his hearing on May 21, 2012, where the examination of both ears found that the canals were clear and hence normal (id. ¶ 15; Docket No. 71, Ex. A, at Bates 000414).

Plaintiff did not complain about his ears or hearing in June 2012 (Docket No. 68, Defs. Statement ¶ 16). The medical record showed that Plaintiff was a no-show for sick calls four times that month (id.). Plaintiff in response explains that was in protective custody during his stay at Attica, hence he missed sick calls because his escort guards were not present (Docket No. 73, Pl. Aff. ¶ (second) 9). Plaintiff has not contended that he made those sick calls due to his hearing impairments.

On July 3, 2012, Plaintiff was seen for complaints about decreased hearing (Docket No. 68, Defs. Statement ¶ 17). Plaintiff's examination was normal (id.; id., Dr. Stephen Laskowski Decl. ¶ 22). There were no other complaints about hearing in July (id., Dr. Laskowski Decl. ¶ 23; id., Defs. Statement ¶ 17).

On July 31, 2012, Plaintiff was temporarily transferred to Sing Sing Correctional Facility ("Sing Sing") where there were no complaints of hearing loss or pain (Docket No. 68, Defs. Statement ¶¶ 18-19).  On August 9, 2012, Plaintiff complained of dizziness due to the heat in his cell; following a full assessment, medical staff concluded that Plaintiff was with normal limits (id. ¶ 20).  Dizziness is a symptom of Meniere's disease, see Taber's Cyclopedic Medical Dictionary, at 1103 (16th Ill. Ed. 1989) (see Docket No. 63, Pl. Aff. Ex. A, pamphlet "Meniere's Disease:  Understanding Your Inner Ear Problem," at Page 8 of 46).  While still at Sing Sing, on August 10, 2012, Plaintiff was seen by Dr. Ezekwe; here, Plaintiff denied dizziness but complained of right ear pain (Docket No. 68, Defs. Statement ¶ 21).  After prescribing ear drops and antibiotics, Dr. Ezekwe noted that Plaintiff's brief bouts of dizziness may have been due to his chronic back pain (id.).  Dr. Ezekwe saw Plaintiff again on August 13, 2012, but Plaintiff did not complain about his hearing (id. ¶ 22).  On August 17, 2012, a physician's assistant diagnosed Plaintiff with allergic rhinitis with right tympanic membrane congestion (id. ¶¶ 23, 24 n.2).  Plaintiff states that he had to disclose to anyone he met at Sing Sing that he had to read lips when people talked to him (Docket No. 73, Pl. Aff. ¶ 10).

Plaintiff returned to Attica on August 21, 2012, and was examined upon his return and found to have had an ear infection while at Sing Sing (id. ¶ 25).  Plaintiff was prescribed antibiotics to run through August 23, 2012 (id.); on August 24, however, Plaintiff returned to sick call complaining of an earache (id. ¶ 26).  On August 30, 2012, Plaintiff was on the sick call again, but not mentioning his ears or hearing (id. ¶ 27).  Plaintiff next complained of his ears on September 14, 2012, when he complained of an earache in his right ear (id. ¶ 28).  The examination found that plaintiff's tympanic

membrane was slightly bulging, and Plaintiff was placed on a follow up sick call for September 17, 2012 (id.).  But on September 20, 2012, Plaintiff's medical chart noted that he was a no-show for his requested sick call (id. ¶ 29).

On September 25, 2012, Plaintiff met with Defendant Dr. Laskowski who noted that Plaintiff stated that he suffered decreasing hearing for the last six months but no dizziness or history of trauma (id. ¶ 30), despite the fact that Plaintiff's transfer to Sing Sing (and dizziness there) was within that prior six months.  Dr. Laskowski noted no mastoid tenderness, no pre auricular tenderness, detected right tympanic membrane scarring, with no inflammation of external canal and no drainage (id.).  Dr. Laskowski referred Plaintiff to an otolaryngologist (id. ¶¶ 30, 31).   Plaintiff was seen by otolaryngologist Dr. Beverly Prince on October 9, 2012 (id. ¶ 32; Docket No. 71, Ex. A, Bates No. 000482).  This is possibly when Plaintiff claims he was diagnosed with Meniere's disease (Docket No. 1, Compl. ¶ 4); cf. Docket No. 63, Pl. Aff. Ex. A, "Meniere's Disease:  Understanding Your Inner Ear Problem" pamphlet, with note "October 9, 2012 Wendy's [sic] Cor. Fac. October 23, 2012 failed to give meds," at Page 8 of 46).  Plaintiff wrote to the Attica medical department on December 8, 2012, claiming that he had Meniere's disease to obtain a shake awake alarm (Docket No. 63, Pl. Aff. Ex. A, at Page 16 of 46) and a nurse administrator for Attica responded on December 18, 2012, that they were waiting for further tests before issuing the shake awake alarm (id. at Page 17 of 46).

Dr. Laskowski on October 22, 2012, requested a CT scan for Plaintiff to examine his right mastoid and middle ear (Docket No. 68, Defs. Statement ¶ 33), which was conducted on December 15, 2012 (id. ¶ 35).  On November 6, 2012, Plaintiff requested a shake awake alarm clock from the nurse (id. ¶ 34).  Dr. Laskowski requested follow-up

consults for Plaintiff with an otolaryngologist (id. ¶¶ 37, 38).  On January 29, 2013, Plaintiff met with Dr. Gullo, an audiologist, who found Plaintiff's tympanic membrane to be normal and that he had "totally unreliable inconsistent results and response" (id. ¶ 39).  On February 5, 2013, Plaintiff met again with Dr. Prince, who noted that Plaintiff had decreased hearing in both ears, stating that his hearing came and went, and suggested testing Plaintiff for syphilis (id. ¶ 41).  Plaintiff contends, however, that this treatment was not discussed with Plaintiff and medication was not ordered for him (Docket No. 73, Pl. Aff. ¶ 13).

On May 6, 2013, Plaintiff saw an audiologist and found "normal tympanograms AU. Right, moderate sensorineural loss @ 250-8Khz (8000).  Left, severe-profound sensorineural loss @ 250-8Khz" (Docket No. 68, Defs. Statement ¶ 43; Docket No. 71, Defs. Ex. A, Bates 000299).  From May 23 to December 2013, Plaintiff had other medical conditions and sought treatment for them but did not mention his hearing (Docket No. 68, Defs. Statement ¶ 46).  On December 12, 2013, Dr. Laskowski requested an audiologist consult to fit Plaintiff for bilateral hearing aids (id. ¶ 47; see id. ¶ 48).  Plaintiff then met with an audiologist and otolaryngologist (id. ¶¶ 49-51).

Plaintiff contends that Dr. Laskowski should have informed someone of Plaintiff's hearing impairment or provide accommodations required by law and Directive 2612 (Docket No. 73, Pl. Aff. ¶ 12).

In February 2014, Plaintiff was transferred to Great Meadow Correctional Facility (Docket No. 68, Defs. Statement ¶ 52; see Docket No. 73, Pl. Memo. at Page 120 of 128) and, on May 20, 2014, he was designated as having an HL20 level of hearing loss (Docket No. 68, Defs. Statement ¶ 53; Docket No. 71, Defs. Ex. A, Bates No. 000095; Docket

No. 63, Pl. Aff. Ex. B, DOCCS Dir. 2612, II.G. at internal page 2 of 16, HL20 is "hard of hearing"), with this assessment to determine whether accommodations are necessary for the inmate (Docket No. 68, Defs. Statement ¶ 53).

Defendants contend that Plaintiff's medical record does not indicate a diagnosis of Meniere's disease (id. ¶ 54; Docket No. 71, Defs. Ex. A, Bates No. 000095-97, DOCCS Health Services Medical Problem List by Type, Apr. 7, 2016).  Prior to May 6, 2013, there was no diagnosis or medical determination of hearing loss (Docket No. 68, Defs. Statement ¶ 55; id., Dr. Laskowski Decl. ¶ 67).

Defendant Dr. Evans did not meet with Plaintiff in December 2011 (Docket No. 68, Defs. Statement ¶ 56) as Plaintiff alleges (Docket No. 1, Compl. ¶ 5).  Dr. Evans was no longer at Attica as of November 25, 2011 (Docket No. 68, Defs. Statement ¶ 56; id., Dr. Evans Decl. ¶ 11) and he last saw Plaintiff on October 28, 2011 (Docket No. 68, Defs. Statement ¶¶ 57, 58; id., Dr. Evans Decl. ¶ 10; Docket No. 71, Defs. Ex. A)

Ms. King also did not see Plaintiff in March 2012 (Docket No. 68, Defs. Statement ¶ 59) as he claimed (Docket No. 1, Compl. ¶ 5 ("a female doctor named King")).  Ms. King last saw Plaintiff on December 22, 2011 (Docket No. 68, Defs. Statement ¶ 60) and King was no longer employed by DOCCS as of February 3, 2012 (id. ¶ 59).  Plaintiff confirms this in his deposition testimony, saying that he only met King in December 2011 (id. ¶ 61; id., Defs. Atty. Decl. Ex. E, Pl. EBT Tr. at 42-43).

Plaintiff never made a formal request for reasonable accommodations for his hearing (Docket No. 68, Defs. Statement ¶ 62) and he did not file any grievance from December 2011 through January 2014 (while in Attica) regarding any denial of ADA reasonable accommodations (id. ¶ 63).

### 2.  Defense Arguments

Defendants first argue that Plaintiff failed to allege the personal involvement of Dr. Evans and Ms. King, necessary to state a deliberate indifference civil rights claim (Docket No. 68, Defs. Memo. at 3).  They point out that Dr. Evans is no longer a DOCCS employee and no longer works at Attica.  Defendants deny being deliberately indifferent to Plaintiff's medical needs (id. at 5-13).  Next, Plaintiff failed to exhaust his administrative remedies to assert Americans with Disabilities and Rehabilitation Act claims in this Court (id. at 13-17).  They deny that Plaintiff can maintain a Title II Americans with Disabilities Act or Rehabilitation Act claims (id. at 17-23).  Defendants assert qualified immunity (id. at 23-25).  They do not address the timeliness of New York State's Answer.

### 3.  Plaintiff's Responses

Plaintiff responds, first, that he alleged the personal involvement of Dr. Evans and Ms. King (Docket No. 73, Pl. Memo. at Pages 107 to 113 of 128).  He argues that they were directly involved in infractions and this exhibited deliberate indifference by failing to act (id. at Page 108 of 128).  He faults them for not recording his hearing condition and those omissions constitute their personal involvement (id.).

Plaintiff concedes that he did not grieve these deprivations, arguing that he feared using the grievance system while in Attica (id. at Pages 114-15 of 128).  Plaintiff notes that in June 2011 corrections officer named Vergio hit Plaintiff in the ankle with Vergio's baton and, aware of Plaintiff's hearing problems, informed Plaintiff that "if he grieved him things would be worst" (Docket No. 73, Pl. Aff. ¶ 7).  Instead, Plaintiff attempted to grieve once he transferred to another facility, thus filing a late grievance (Docket No. 73, Pl. Memo. at Page 114 of 128).

13

Nevertheless, Plaintiff contends that he established the objective prong for his deliberate indifference claim from his worsened hearing during his incarceration at Attica (Docket No. 73, Pl. Memo. at Pages 109-11 of 128), contending that he was administered Claritin for his ear issues despite not having any allergies (id. at Pages 111-12 of 128). For the subjective prong, Plaintiff argues that the individual Defendants were aware of his deteriorating condition yet did nothing save prescribe "non functional [sic] medication" and failing to treat his hearing impairments (see id. at Pages 112-13 of 128).

Plaintiff argues that defense counsel should have obtained declarations from other Attica staff, including a psychologist Plaintiff met with and discussed his hearing problems (Docket No. 73, Pl. Aff. ¶ 19).  Plaintiff does not argue that he could not respond to these fact assertions absent these declarations.

As for his ADA and Rehabilitation Act claims, Plaintiff argues that his impaired hearing as first detected when he arrived at Downstate Correctional Facility in 2009 (see Docket No. 63, Pl. Aff. Ex. C) was a disability under both acts, impacting a major life activity (Docket No. 73, Pl. Memo. at Pages 115-17 of 128).  He contends that he faced discrimination based upon his disability after his transfers from Attica, especially at Five Points Correctional Facility's special housing unit (id. at Pages 120-21 of 128) and he emphasized the procedures used in transferring him disregarded his disability (id. at Pages 120-22 of 128).

### 4.  Defense Reply

Defendants reply that Plaintiff's stated fear preventing him grieving his claims is without merit since security staff at Attica was  unaware of his alleged ADA claims or any proof, they threatened him if he grieved this claim (Docket No. 74, Defs. Atty. Reply Decl.

¶ 5).  "An alleged blank fear of retaliation is insufficient" (id.).  His fear argument is diminished by Plaintiff filing grievances while at Attica for other contentions (id. ¶ 6; see Docket No. 52, Defs. Rule 26 Initial Disclosure at 48-49 (one grievance filed Sept. 13, 2011, for spoiled and missing food while in Attica)).  One of the grievances Plaintiff requested a specialist, filing the grievance on October 10, 2012, and a second grievance days later claimed that Plaintiff was denied medication (Docket No. 52, Defs. Rule 26 Disclosure at 49).  The listing of closed grievances (id.), however, gives little detail and it is not clear that these grievances involve Plaintiff's impaired hearing.  Defendants conclude that Plaintiff cannot now argue that the grievance process was not available for him (Docket No. 74, Defs. Atty. Reply Decl. ¶ 6).

Defendants focus Plaintiff's claims to those asserted in the original Complaint arising from his incarceration in Attica and not in subsequent transfer facilities (id. ¶ 7).  They argue that Plaintiff's response contains general conclusory legal allegations based upon unpersuasive authorities, thus Defendants' motion should be granted (id. ¶ 8; see also id. ¶¶ 4, 10).

### III.   DISCUSSION

### A.  Applicable Standards

#### 1.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A fact is "material" only if it "might affect the outcome of the suit under governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A "genuine" dispute, in turn,

exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," id.  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion," Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970) (internal quotations and citations omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper," Bryant v. Maffucci, 923 F.32d 979, 982 (2d Cir. 1991) (citation omitted).  Indeed "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 f.3d 77, 82,-83 (2d Cir. 2004) (citation omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson, supra, 477 U.S. at 249.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009), citing, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting Celotex, supra, 477 U.S. at 323).  The party against whom summary judgment is sought, however, "must do more

16

than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original removed).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant.  Ford, supra, 316 F.3d at 354.

As briefly noted above, the Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2).  The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, id. R. 56(a)(2).  Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id.  Absent such an opposing statement, the facts alleged by the movant are deemed admitted.  Each statement of material fact is to contain citations

to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).

### 2.  Status of Pro se Pleadings

The pleading of a pro se plaintiff is to be liberally construed, see Haines v. Kerner, 404 U.S. 519 (1972) (per curiam).  The pro se plaintiff's complaint thus has to be construed "more liberally" than one filed by counsel, Boykin v. KeyCorp, 521 F.3d 202, 214 (2d Cir. 2008) (see Docket No. 10, Order at 2; see also Docket No. 56, Pl. Memo. at 5).

### 3.  Eighth Amendment Deliberate Indifference

The Complaint alleges a civil rights violation of Plaintiff's right against cruel and unusual punishment under the Eighth Amendment by the individual Defendants; this Court held that such a claim cannot be asserted against New York State due to Eleventh Amendment sovereign immunity (Docket No. 10, Order at 4).   Under the Eighth Amendment, "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."   In order to state a claim for inadequate medical treatment under the Cruel and Unusual Punishment Clause, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," LaGrange v. Ryan, 142 F. Supp. 2d 287, 293 (N.D.N.Y. 2001); see Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Gregg v. Georgia, 428 U.S. 153, 173 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.  1994), cert. denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995).

18

"To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Hathaway, supra, 37 F.3d at 66 (quoting Estelle, supra, 429 U.S. at 104).  Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, see Corby v. Conboy, 457 F.2d 251, 254 (2d Cir. 1972).

This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind.  Hathaway, supra, 37 F.3d at 66.  "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain."  Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) (quoted in Hathaway, supra, 37 F.3d at 66).

> "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Farmer v. Brennan, 511 U.S. 825, 837 (1994) (Docket No. 68, Defs. Memo. at 6). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," Estelle, supra, 429 U.S. at 106.  Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) ("[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003) (medical malpractice alone does not amount to deliberate indifference); Gomez v. County of Westchester, 649 F. App'x 93, 96 (2d Cir.

2016) (summary Order) (holding failure to diagnose infection at most supported only an inference of negligence, not recklessness to state a deliberate indifference claim).

One court held that "when a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." Pabon v. Goord, No. 99 Civ. 5869, 2003 U .S. Dist. LEXIS 5359, at *35 (S.D.N.Y. Mar. 28, 2003) (citing Smith v. Carpenter, 316 F.3d 178 (2d Cir. 2003)); Torres v. Alers, No. 04 Civ. 1172 (LAP), 2005 WL 2372741, at *2 (S.D.N.Y. Sept. 26, 2005).

The subjective element reflects the imposition of punishment, which the Eighth Amendment prohibits infliction of cruel punishment, Farmer, supra, 511 U.S. at 837. Recklessness for the subjective element means Defendants consciously disregarded a substantial risk of serious harm, id. (quoting Model Penal Code § 2.02(2)(c)).   Plaintiff also proves the subjective element by showing that Defendants wantonly intended to cause him to suffer.  Wilson v. Seiter, 501 U.S. 294, 302 (1991).

Plaintiff also needs to establish that the individual Defendants named are involved in the alleged constitutional violation to recover damages from them, Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (Docket No. 68, Defs. Memo. at 3; see also Docket No. 73, Pl. Memo. at Page 107 of 128).  A government official, regardless of title, "is only liable for his or her own misconduct," id., at 677.   In this Circuit, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quotation marks omitted) (on supervisory liability) (see Docket No. 68, Defs. Memo. at 3); Shomo .v City of N.Y., 579 F.3d 176, 184 (2d Cir. 2009); Wright v Smith, 21 F.3d 496, 501 (2d Cir. 1994).

4.  Americans with Disabilities Act and Rehabilitation Act

This Court previously held that Plaintiff stated claims under the Rehabilitation Act and Americans with Disabilities Act only against Defendant New York State and not against the individual Defendants (Docket No. 10, Order at 5).  Using the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), burden shifting for the Americans with Disability Act claim, see Sista v. CDS Ixis N. Am., Inc., 445 F.3d 161, 169 n.2 (2d Cir. 2006), Plaintiff had to establish a prima facie case that he was disabled, that is that he suffered from a physical or mental impairment, identified an activity that has been impaired and show that it is a "major life activity," and show that the impairment "substantially limits" that major life activity, 42 U.S.C. § 12102(1)(A)-(C); see Weixel v Board of Educ. of N.Y., 287 F.3d 138, 147 (2d Cir. 2002) (Docket No. 68, Defs. Memo. at 18).

Money damages are available under Title II of the ADA only where Plaintiff demonstrates intentional discrimination, Frank v. Sachem School Dist., 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015); Loeffler v. Staten I. Univ. Hosp.., 582 F.3d 268, 275 (2d Cir. 2009) (law well settled that intentional violations of Title VI, the ADA and Rehabilitation Act can call for money damages; citation omitted).  To comport with the Fourteenth Amendment section 5 authority for Congress to implement that amendment, Title II is limited to violations that are "motivated by discriminatory animus or ill will based on the plaintiff's disability," Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001); Frank, supra, 84 F. Supp. 3d at 186.

Under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a).  The Rehabilitation Act incorporates the standards of the Americans with Disabilities Act, Cheung v. Donahoe, No. 11-CV-122, 2016 WL 3640683, at *5 (E.D.N.Y. June 29, 2016); Rodriguez v. City of N.Y., 197 F.3d 611, 618 (2d Cir. 1999) (considering two statutes "in tandem" because they "impose identical requirements"); Kelly v. New York State Office of Mental Health, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016).  As noted by the court in Kelly, 200 F. Supp. 3d at 390, "the only significant difference between the two statutes is that the Rehabilitation Act, under the ADA, requires that the alleged discrimination take place 'solely due to an individual's disability,'" id., quoting Amie v. Shineski, 806 F. Supp. 2d 641, 644 (W.D.N.Y. 2011) (Larimer, J.) (citations omitted).  Plaintiff has to establish a prima facie case, as he or she would under the ADA, but also needs to prove that Defendant receives federal funds, Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009).  Defendants here concede that DOCCS received federal funds (Docket No. 68, Defs. Memo. at 18).

> 5. Prison Litigation Reform Act and Administrative Exhaustion of Remedies

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), states "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The PLRA "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002), rev'g, Nussle v. Willette, 224 F.3d 95 (2d Cir. 2000).

The PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before binging suit to challenge prison conditions," Ross v. Blake, 578 U.S. ___, 136 S.Ct. 1850, 1855 (2016).   The Supreme Court found that "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case," Nussle, supra, 534 U.S. at 524-25.   The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" id. at 528, and clarify the contours of the controversy once it is litigated, id. at 525.   The only recognized exception to this exhaustion requirements is the absence of remedies, Ross v. Blake, supra, 136 S.Ct. at 1855, 1856-57 (rejecting Fourth Circuit's "special circumstances" exception), 1859-60.

### 6.  Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is whether the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).   As required by the Saucier Court, this Court first considered the constitutional question, then considered the qualified immunity question, id.  But the Supreme Court in Pearson v. Callahan, 555 U.S. 223, 236 (2009), overruled Saucier in requiring courts to first determine whether a constitutional violation occurred before considering whether defendants enjoy qualified immunity.  Instead, district courts determine in each case whether to consider first the question of immunity or whether a constitutional violation has occurred, id. at 231-32.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, see Frank v. Reilin, 1 F.3d 1317, 1327 (2d Cir. 1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity."  Anderson v. Creighton, 483 U.S. 635, 641 (1987); Lowth v. Town of Cheektowaga, 82 F.3d 563, 568-69 (2d Cir. 1996).

B.  Plaintiff's Motion for Summary Judgment (Docket No. 56)

Plaintiff's motion (Docket No. 56) for summary judgment on the tardiness of New York State's Answer is **denied**.  First, below is a table summarizing the timeline of the pleadings and service of pleadings leading up to the service and filing of New York State's Answer.

| |
|---|
| February 7, 2014, Complaint filed (Docket No. 1) |
| June 26, 2015, Order directing notice to Attorney General, authorize service of the Summons and Complaint by Marshals Service (Docket No. 10) |
| December 14, 2015, certificate of service, return of service to individual Defendants (Docket No. 16) |
| December 22, 2015, Summons returned unexecuted as to defendant Indea King (Docket No. 17) |
| February 19 and 23, 2016, acknowledgements of service of Drs. Laskowski and Evans (Docket Nos. 21, 22) |
| March 4, 2016, Answer of Drs. Laskowski and Evans (Docket No. 24) |
| April 4, 2016, Summons to New York State |
| April 26, 2016, Answer of Indea King (Docket No. 32) |
| June 13 and July 18, 2016, notice of defense counsel appearance for Defendants Evans, King, Laskowski (Docket Nos. 35, 36) |
| January 18, 2017, Summons returned unexecuted as to Assistant Attorney General (on behalf of State of New York) (Docket No. 38) |
| January 26, 2017, Plaintiff's deposition (Docket No. 55, Pl. Motion for Summary Judgment ¶ 8) |

| |
|---|
| February 27, 2017, Plaintiff letter to Assistant Attorney General Denetra Roberts (Docket No. 42) |
| March 7, 2017, New York State Answer (Docket No. 43) |

Plaintiff's argument is based upon the June 2015 Order (Docket No. 10; see Docket No. 55), contending that it set New York State's deadline to answer (cf. Docket No. 10, Order of June 26, 2015, at 7 & n.1) that the State missed.  But any deadline for service of an Answer was dependent upon New York State being served with the Complaint (cf. Docket No. 73, Pl. Aff. ¶ 15, quoting "Pro Se Litigation Guidelines," "once the summon [sic] and complaint is served"), despite the service upon the individual Defendants.  By March 2016, New York State was not served with the Complaint while the individual Defendants were served and had answered.  Although all defendants share the same counsel (the New York State Attorney General's Office), each defendant needed to be served before they were formally in the case, see generally Fed. R. Civ. P. 4.

Plaintiff, by proceeding in forma pauperis, incarcerated, and having obtained Orders for service of pleadings (Docket Nos. 10, 30), became dependent upon the Marshal Service in effecting that service, see Fed. R. Civ. P. 4(c)(3).  Under Rule 4(j)(2), service of New York State is either by serving the Governor (the state's chief executive officer) or service by the method outlined in state law, id., R. 4(j)(2)(A), (B); in New York, service of the state government under the Civil Practice Law and Rules 307(1) is by service of an Assistant Attorney General or the Attorney General.

This Court's Order of June 26, 2015 (Docket No. 10), and Plaintiff's letter (Docket No. 42, letter Plaintiff to Assistant Attorney General Gary Levine, Feb. 27, 2017; Docket No. 55, Pl. Ex., same; Docket No. 65, Pl. Aff. ¶ 1-3) alone without a Summons and

Complaint does not constitute service, see Fed. R. Civ. P. 4(c)(1) (a Summons must be served with a copy of the Complaint).   Judge Wolford's Order called for issuance of Summonses to be served upon Defendants, including New York State (Docket No. 10, Order at 6, 7) with Plaintiff to submit Summonses, the United States Marshal forms, and a copy of the Complaint for each Defendant to the Marshal Service for service upon New York State and the three individual Defendants (id. at 7).   The Marshal then was to collect its fee and serve the Complaint and the Order upon Defendants (id.).   The Order directed the Clerk to send a copy of that Order to the Assistant Attorney General in Charge of the Rochester office (id.) and not sending copy of the Complaint or any Summons.

That Order did not serve the Summons and Complaint upon New York State or the Assistant Attorney General in Charge, it called upon the U.S. Marshal to do it once it received the Summons and Complaint from Plaintiff (id.).   By receipt of that Order, the Assistant Attorney General in Charge merely would be on notice of the existence of the case and anticipate service of the Summons and Complaint.   That attorney still is not served on behalf of New York State, despite his knowledge of the case from the later service of the individual Defendants.   That Order is not a substitute for the Complaint.

As later noted by Magistrate Judge Foschio on March 29, 2016, to that date there was no attempt to serve New York State (Docket No. 30, Order at 2).   Magistrate Judge Foschio again ordered that New York State be served by the Marshals Service pursuant to Fed. R. Civ. P. 4(j)(2) (as outlined above, either upon the Governor or delivery to the office of the Attorney General) (id.), without setting a deadline for the Marshal to serve or a deadline for New York State to answer.   The Answer deadline remained contingent upon the State being served with the Complaint.   Rule 12 of the Federal Rules

of Civil Procedure generally provides that a defendant must serve an Answer within 21 days after being served, Fed. R. Civ. P. 12(a)(1)(A)(i), assuming no waiver of service, cf. id., R. 12(a)(1)(A)(ii).

On January 18, 2017, the Summons to New York State was returned unexecuted to the Assistant Attorney General (Docket No. 38), with that form noting that the Summons was mailed on April 5, 2016, but "returned not served" on January 17, 2017 (id.).  Thus, New York State was yet to be served as of January 2017.

The individual Defendants deposed Plaintiff on January 26, 2017, and Plaintiff there asked defense counsel if she represented New York State and she answered she did not since the State had not (yet) appeared (Docket No. 55, Pl. Motion ¶ 8).  After Plaintiff sent and filed his letter of February 27, 2017 (Docket No. 42, entered Mar. 3, 2017), to defense counsel, the State of New York answered on March 7, 2017 (Docket No. 43).

Unlike the codefendants (cf. Docket Nos. 21, 22), there is no filed return of service executed upon the State of New York (either upon the Governor or an Assistant Attorney General); the record does not state when service occurred.  Defendants also have not addressed when New York State was served with the Complaint or the timeliness of the State's Answer (but cf. Docket No. 74, Defs. Atty. Reply Decl. ¶ 9 (noting Court Clerk's rejection of Plaintiff's motion for entry of default against the State of New York, Docket No. 65)).  Thus, this Court cannot determine whether the Answer is timely under Rule 12(a)(1)(A)(i).

Regardless, the State of New York's Answer (Docket No. 43) **is timely** and therefore Plaintiff's Motion for Summary Judgment (Docket No. 56) in his favor for the

State's purported default is **denied**.  Plaintiff is not prejudiced by the timing of New York State's Answer almost a year after Answers by the individual codefendants (Docket No. 43; <u>but cf.</u> Docket No. 65, Pl. Aff. ¶ 4 (claiming delay of one year and nine months)) despite his stated confusion as to who represented the Defendants (Docket No. 45).

Plaintiff also raises in this motion his expectation to be deposed again by Defendants with the appearance of New York State and anticipated production to him, but that deposition did not occur (Docket No. 56, Pl. Memo. at 4).  Defendants meanwhile moved to amend the Scheduling Order (Docket No. 39; <u>see</u> Docket No. 34, Scheduling Order) which was granted (Docket Nos. 40, 41).  They also moved to reopen discovery (Docket No. 44), which Plaintiff did not object to (Docket No. 47, Pl. Ans. to Decl. ¶ 2); Plaintiff only sought materials from Defendants if he were deposed again (<u>id.</u> ¶ 7).  This Court granted Defendants' motion (Docket Nos. 48, 49).  Plaintiff now argues that Defendants sought that extension with the intention to resume his deposition but then never deposed him (Docket No. 56, Pl. Memo. at 4; <u>see also</u> Docket No. 45, Pl. letter to Assistant Attorney General Denetra Roberts, Mar. 20, 2017).  Implicitly Plaintiff seems to move to compel discovery, but no specific requests have been submitted in this motion.

Defendants are not required to depose a Plaintiff and, having deposed Plaintiff for the same factual allegations alleged against the individual Defendants, the defendant State of New York did not need to depose Plaintiff.  Plaintiff did not seek to depose defendant New York State (or representative officials) or argue against summary judgment because discovery was necessary to resolve issues of material fact, <u>cf.</u> Fed. R. Civ. P. 56(d).  Plaintiff only informally sought documents from defense counsel in anticipation of his further examination (<u>e.g.</u>, Docket Nos. 47, 61), but that examination did

not occur.  Plaintiff did not notice their production or move to compel further discovery. Plaintiff, in fact, then filed his own motion for summary judgment (Docket No. 56) without indication that he needed further discovery to proceed or required additional material to respond to Defendants' motion.  Later, he did move to compel discovery (Docket No. 81) but only seeking return of documents from the Wende Correctional Facility mail room, grievance office, and deputy superintendent of program's office for a mail room request made in July 5, 2018 (id., Notice of Motion), years after the events alleged in the Complaint (see Docket No. 85, Order of Sept. 24, 2018, at 2, denying motion).  He did not seek the materials he sought in 2017 that he anticipated would have been produced at his continued deposition.

Thus, the delay in New York State in answering the Complaint was due to delays in service of the State by the Marshals Service and the period from service until it answered did not prejudice Plaintiff (despite the consented extension of the pretrial schedule and reopening of discovery).  Plaintiff's motion (Docket No. 56) for summary judgment on this ground is **denied**.

Plaintiff's substantive arguments in favor of judgment for him (id.) also are his arguments opposing Defendants' motion and will be considered next.

### C.  Defendants' Motion (Docket No. 68)

#### 1.  Scope of This Action

Plaintiff through attempts at amending the Complaint (e.g., Docket Nos. 8, 75; see also Docket No. 9 (motion to change venue, alleging events occurring in facilities in the Southern District of New York)) and motions to add parties and claims seeks to litigate much of his time in DOCCS custody, claiming that he was subsequently transferred from

Attica in 2014 to five other maximum-security facilities (Docket No. 73, Pl. Memo. at Page 120 of 128).

The Complaint, however, only alleges incidents and the lack of treatment while Plaintiff was incarcerated in Attica in December 2011 to September 2012 and violations of the ADA and the Rehabilitation Act while in Attica in December 2011 to January 2014 (see Docket No. 74, Defs. Atty. Reply Decl. ¶ 2; Docket No. 63, Pl. Aff. Ex. C (DOCCS Internal Movement History, Reynaldo Perez)), presumably excluding the period in 2012 when he was transferred temporarily to Sing Sing (see Docket No. 63, Pl. Aff. Ex. C). This Court will not revisit the decisions denying Plaintiff's motions for leave to amend or add parties (Docket Nos. 10, 12, 84) to broaden the scope of this action beyond Plaintiff's incarceration in Attica from 2011 to 2014.

Construing Plaintiff's Complaint liberally as this Court must for a pro se pleading, Haines, supra, 404 U.S. 519, Plaintiff alleges two causes of action: deliberate indifference by the individual Defendants from December 2011 to September 2012, and violation by Defendant State of New York of his rights under the ADA and Rehabilitation Act from December 2011 to January 2014 (see Docket No. 10, Order at 3-5). Both claims have as the underlying disabling condition is Plaintiff's hearing. This Court first will consider defenses arising from Plaintiff's deliberate indifference claim and then those under the ADA and Rehabilitation Act claims.

### 2. Deliberate Indifference

As for the objective prong for a deliberate indifference claim, Plaintiff cannot recover for the period before his condition was diagnosed, from December 2011 to October 2012 (giving credence to Plaintiff's statement that he was diagnosed by that

date).  Plaintiff's argument for this period is that Dr. Evans and Ms. King failed to note or record his hearing impairments.  Plaintiff has not provided evidence beyond his own testimony that he had a serious medical need.  He states that he was admitted to DOCCS custody with a degree of hearing loss (see Docket No. 73, Pl. Memo. at Pages 116 of 128; Docket No. 63, Pl. Aff. Ex. C) that worsened over time.  What Plaintiff alleges from December 2011 to October 2012 is at worst negligence or medical malpractice, neither of which are actionable as a constitutional violation, Corby, supra, 457 F.2d at 254.  "As a matter of settled law, the mere fact that a prison medical provider misdiagnosed a patient or failed to recognize the severity of his condition cannot, standing alone, support an Eighth Amendment claim—even where the mistake was obvious or highly consequential," Farah v. Richeson, No. 3:19-cv-01247 (CSH), 2019 WL 4247919, at *4 (D. Comm. Sept. 6, 2019) (citing cases, including Felipe v. New York State Dep't of Correctional Servs., No. 95-CV-1735, 1998 WL 178803, at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, J.) (granting defendants judgment on pleadings where plaintiff who complained of stomach pain eventually was diagnosed with gallbladder disease, concluding that plaintiff's allegations were "nothing more than possible medical malpractice or negligence")).  The failure to diagnose the proper malady "does not evince a 'culpable recklessness,'" Graham v. County of Erie, No. 11CV605, 2012 WL 198069, at *7 (W.D.N.Y. May 31, 2012) (Skretny, C.J.).

In contrast, this case is not the situation in Hemmings v. Gorczyk, 134 F.3d 104, 109 (2d Cir. 1998), where allegations of deliberate indifference survived a motion to dismiss after medical staff refused to send plaintiff to a specialist and later, when plaintiff

was examined by a  specialist, that examiner described that plaintiff's condition as classic and expressed shock at the medical staff's failure to diagnose and treat plaintiff's injury.

From the record submitted herein, Plaintiff had few sick calls from December 2011 to October 2012 and some of those sick calls were for other ailments where Plaintiff did not also raise his hearing as a concern.  Plaintiff does not argue that he missed sick calls (Docket No. 68, Defs. Statement ¶ 16; Docket No. 73, Pl. Aff. ¶ (second) 9) that he sought due to his hearing because of his security status.  No reasons are given for the missed sick calls.  The record here merely shows the few times Plaintiff sought treatment for any ailment and the subset of times he mentioned his hearing.

Once Plaintiff was diagnosed with Meniere's disease (although Defendants contend that Plaintiff was never diagnosed with this malady, Docket No. 68, Defs. Statement ¶ 54), the record indicates instances when Plaintiff infrequently complained to Attica's medical staff, he received treatment, eventually to referral to a specialist.

More about the Meniere's disease diagnosis.  Defendants claim that Plaintiff was not diagnosed with Meniere's disease while at Attica or had any hearing loss prior to May 6, 2013 (id. ¶¶ 54-55).  The record presented includes referrals for consultations where one outside doctor, Dr. Prince, observed that Plaintiff was evaluated for hearing loss with vertigo (Docket No. 68, Defs. Statement ¶ 48; Docket No. 71, Defs. Ex. A, Bates No. 000297, consultation request, Dec. 26, 2013).  While Plaintiff has not produced additional medical evidence aside from his DOCCS health records provided by Defendants, there is an issue of fact whether he was diagnosed with Meniere's disease or suffered diminished hearing during his incarceration at Attica.  Thus, there is a material

32

issue of fact as to the objective prong for a deliberate indifference claim under the Eighth Amendment.

On the subjective prong, however, Plaintiff has not established that the individual Defendants acted maliciously in denying treatment for his ears and hearing loss.  Plaintiff merely repeats his contention that Dr. Evans and Ms. King knew he had hearing issue but failed to record it or treat it; he does not allege what Dr. Laskowski failed to do.  Dr. Laskowski, in fact, sought specialist consults to treat Plaintiff's hearing and ear issues (see Docket No. 68, Defs. Memo. at 8).  The subjective prong requires Plaintiff to show that Drs. Evans, Laskowski, and Ms. King had a sufficiently culpable state of mind, that they acted recklessly or in malice in failing to record his hearing condition or treating his ears.  Even if accepting that Plaintiff's hearing impairments were obvious to the individual Defendants, Plaintiff has not established malicious  or criminally reckless, see Farmer, supra, 511 U.S. at 837, culpability to establish the subjective prong.

On this basis, Defendants' motion (Docket No. 68) for summary judgment is **granted**.

### 3.  Personal Involvement

Defendants also argue that Plaintiff failed to establish the involvement of Dr. Evans or Indea King in being deliberately indifferent to his medical needs (Docket No. 68, Defs. Memo. at 3).  Given the findings above that Plaintiff failed to state a claim generally for deliberate indifference, this Court need not tarry over the involvement (or lack thereof) of Dr. Evans or Ms. King.  This Court notes that Dr. Evans saw Plaintiff once in this record and Ms. King saw Plaintiff once and made a later notation in his chart.  If Plaintiff's allegation is that these Defendants should have noticed and then noted his hearing

issues, as found above these fail to allege either the objective or subjective prong for a deliberate indifference claim under the Eighth Amendment.

### 4.   Failure to Exhaust Administrative Remedies

As an inmate, Plaintiff's claims are governed by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a) (or "PLRA").   The Supreme Court in Ross v. Blake limited exceptions to the administrative exhaustion requirement of the PLRA to only those arising from the text of the Act, 136 S.Ct. at 1856-58, rejecting the Fourth Circuit's "special circumstances" exception, Blake v. Ross, 787 F.3d 693, 698 (4th Cir. 2015), similar to the Second Circuit's analysis, Ross v. Blake, supra, 136 S.Ct. at 1856, citing e.g., Giano v. Goord, 380 F.3d 670, 676 (2d Cir. 2004).   Instead, the Court focused on the textual exception based upon the availability of administrative relief, 136 S.Ct. at 1858.   The Court stated three kinds of circumstances that relief may not be available:   remedy that is "a simple dead end"; an administrative scheme "so opaque that it becomes, practically speaking, incapable of use"; or process thwarted by machination, misrepresentation, or intimidation that prevent use of proper procedures, id., 136 S.Ct. at 1859-60.

Defendants contend that Plaintiff knew of his administrative remedies regarding denied medical treatment but did not exhaust them (not filing a grievance or even informally requesting accommodation at Attica), thus barring his ADA and Rehabilitation Act claims (Docket No. 68, Defs. Memo. at 16-17, 13-14; id., Defs. Statement ¶¶ 62-63).

Plaintiff argues that he feared filing grievances since he was in Attica (Docket No. 73, Pl. Memo. at Page 114 of 128).   He intended to grieve once he was transferred to another facility, but that grievance may have been untimely (id.).   He cites to one instance in June 2011 when a corrections officer hit him and threatened him not to grieve

it (Docket No. 73, Pl. Aff. ¶ 7).  But Plaintiff has not shown that he was threatened if he grieved the denial of diagnosis or medical treatment of his hearing impairment (see Docket No. 74, Defs. Atty. Reply Decl. ¶ 5).  Defendants contend that Plaintiff grieved while at Attica, thus he cannot argue that the process was not available to him (id. ¶ 6).

Plaintiff did not grieve (or appeal any denial in a grievance) the failure to grant accommodations for his hearing loss.  There are two closed grievances (Docket No. 52, Defs. Rule 26 Disclosure at 49) for Plaintiff that might involve requesting accommodation for his hearing, but he has not argued that these grieved his ADA and Rehabilitation Act claims and the record is silent as to the nature of the denied accommodations.  The history of Attica and the purported history of "prison guard abuse" (cf. Docket No. 73, Pl. Memo. at Page 114 of 128) does not excuse Plaintiff from attempting to exhaust his administrative remedies.  His argument is akin to the "special circumstances" argued unsuccessfully in Ross v. Blake, supra, 136 S.Ct. at 1850.

Defendants' motion for summary judgment on this failure to exhaust grounds is **granted**.  Because of this Plaintiff's entire ADA and Rehabilitation Act claims fail, but for a complete record, this Court next considers the substance of these disability claims.

### 5. Disability Claims

Defendants next contend that Plaintiff cannot maintain a claim under Title II of the Americans with Disabilities Act or § 504 of the Rehabilitation Act.  First, Defendants argue that Plaintiff was not a qualified individual because there was a sparse record of impairment for Plaintiff made few complaints about his hearing loss in 2011-12 (the period of Plaintiff's claims in this action) (Docket No. 68, Defs. Memo. at 18-19).  They contend that Plaintiff had no record of impairment when he requested a shake awake alarm,

hearing aid, and a telephone amplifier (id. at 19, 20) while his examinations of his ears were normal (id. at 19).  Defendants contend that Plaintiff was found to have hearing loss on May 6, 2013, when the audiologist recommended further testing to confirm the results that indicated diminished hearing (id.).  Over a year later, Plaintiff was found to be HL20, hard of hearing level of impairment (id.), the level that would authorize some forms of accommodation by DOCCS.

As mentioned with the deliberate indifference claim, Defendants raise the fact issues whether Plaintiff had Meniere's disease and hearing loss, Plaintiff's claimed disabilities.  Plaintiff pointed to a diagnosis outside of DOCCS of Meniere's disease in October 2012 (Docket No. 1, Compl. ¶ 4).  Plaintiff started with a hearing impairment when incarcerated.

One element under both the ADA and Rehabilitation Act is a record of Plaintiff's impairment.  Plaintiff here only claims that he had hearing loss and Meniere's disease and did not have a diagnosis in this record until May 2013.  Aside from his Complaint and deposition testimony, there is no other evidence of Plaintiff suffering either malady.  Plaintiff focuses on proof of his disability, arguing that hearing loss was a loss to a major life activity (Docket No. 73, Pl. Memo. at Pages 116-17 of 128).  He failed to present further evidence that he suffered these losses.

Plaintiff also did not address the elements of animus or ill will or deliberate indifference (save his earlier argument of failing to diagnose) or denial of services by reason of his hearing loss.  Plaintiff also has not shown that his hearing impairment has substantially limited a major life activity.  While hearing loss is a major life activity, 42 U.S.C. § 12102(2)(A) (Docket No. 73, Pl. Memo at Page 116 of 128), Plaintiff has not

shown that he has been limited by it.  First, he had hearing loss since his youth and had it when he began his incarceration.  He did not raise his hearing impairment in the record by frequent requests for sick calls to address it.  He read lips and had to have speakers face him to understand the speakers.  Only later in his stay at Attica did he request a shake awake alarm and other adaptive devices (some he requested after his transfer to other DOCCS facilities).  Most of his arguments are for denials of these devices after his transfer from Attica (complaining that his hearing should have been indicated in his medical record to facilitate receiving these accommodations in subsequent facilities).  These transfers, however, are beyond the scope of this action.

Defendants next contend that Plaintiff cannot show that DOCCS excluded him from participating in, or denied him the benefit of, any services or programming "by reason of" his hearing loss (id.).  Defendants point to the record submitted that shows that Plaintiff was never excluded by reason of his disability; his requests for accommodation were pending while Plaintiff's hearing was evaluated because there was no diagnosis of hearing loss in 2011-12 to justify the accommodation (id.).

Therefore, Plaintiff has not established a prima facie case for either the ADA or Rehabilitation Act claims.  Defendants' motion for summary judgment on this ground is **granted**.

Defendants next argue that Plaintiff cannot show that any nondiscriminatory reason for his treatment was a pretext to address the last element under McDonnell Douglas burden shifting (Docket No. 68, Defs. Memo. at 21).  Given Plaintiff's failure to meet his burden of establishing a prima facie case for these claims, this Court need not

shift the burden to Defendants to establish a nondiscriminatory reason for Plaintiff's treatment.

Finally, to recover damages from New York State and avoid Eleventh Amendment immunity, Plaintiff needs to show that the Title II of ADA violation was motivated by discriminatory animus or ill will or deliberate indifference for the Rehabilitation Act claim; Defendants conclude that Plaintiff cannot meet this burden (Docket No. 68, Defs. Memo. at 21-22).  Defendants argue that there was no evidence of ill will or deliberate indifference to make New York State actionable (id. at 22).  This Court also finds that Plaintiff has not shown ill will or deliberate indifference by Defendants' in their treatment of Plaintiff's condition.

Therefore, Defendants' motion for summary judgment seeking dismissal of the Americans with Disabilities Act and Rehabilitation Act claims is **granted**.

### 6.   Qualified Immunity

Finally, Defendants alternatively argue that they should enjoy qualified immunity (Docket No. 68, Defs. Memo. at 23-25).  Given the disposition on the merits stated herein, this Court need not comment on whether Defendants should enjoy qualified immunity.

## IV.    CONCLUSION

Plaintiff's Motion for Summary Judgment (Docket No. 56) based upon the purported belated Answer of the State of New York is **denied**.  Defendant's Motion for Summary Judgment (Docket No. 68) dismissing the case on the substance is **granted**.

## V.    ORDERS

IT IS HEREBY ORDERED, that Plaintiff's Motion for Summary Judgment (Docket No. 56) is DENIED.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 68) is GRANTED.

FURTHER, that the Clerk of Court is DIRECTED to terminate Docket No. 55, Plaintiff's affirmation, as a Motion.

FURTHER, that the Clerk of Court is DIRECTED to send a copy of this Decision and Order to Plaintiff at his current facility (Five Points or Woodbourne Correctional Facility).

FURTHER, that the Clerk of Court is DIRECTED to close this case.

SO ORDERED.


Dated:        September 15, 2020
              Buffalo, New York


                                              s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                              United States District Judge